# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHWESTERN DIVISION

EDIE HOUSEL,           )
                             )
          **Plaintiff,**      )
                             )
    **v.**                            )       **Case No. 3:14-cv-05084-MDH**
                             )
**HD DEVELOPMENT OF MARYLAND, INC.,**   )
**and HOME DEPOT U.S.A., INC.,**      )
                             )
          **Defendants.**     )

## ORDER

Before the Court is Defendants' Motion for Summary Judgment (Doc. 42).  Upon careful review of the issues raised and arguments provided, the Court hereby **GRANTS** Defendants' motion and enters judgment in favor of Defendants and against Plaintiff on all remaining claims.

## I.  BACKGROUND

Plaintiff commenced the present action in state court seeking compensation for the alleged wrongful death of her family members who perished in the Joplin tornado of May 22, 2011.  The petition alleges that Plaintiff's husband and two minor children sought refuge inside the Joplin Home Depot store and that "Plaintiff's decedents were directed to the training room in the back of the building . . . but before they could reach the area, the large unsupported wall panels collapsed on top of them" and "Plaintiff's decedents were killed as a result of injuries sustained during the tornado."  Plaintiff brought the action against Home Depot U.S.A., Inc. d/b/a Home Depot and HD Development of Maryland, Inc. (collectively, "Home Depot") as the alleged owner/operator of the Joplin Home Depot store and against Casco Diversified Corporation ("Casco") as the alleged architect/builder of the Joplin Home Depot store.

Home Depot removed the case to federal district court on the basis of diversity jurisdiction and fraudulent joinder. Home Depot argued that in-state defendant Casco was fraudulently joined because Plaintiff's claims against Casco were barred as a matter of law by Missouri's ten-year statute of repose for tort actions against architects and builders arising from defective improvements to real property. *See generally* Mo. Rev. Stat. § 516.097 (ten-year statute of repose for tort actions against architects, engineers, or builders arising from alleged defective improvements to real property). The Court agreed and dismissed Plaintiff's claims against Casco.

Home Depot's summary judgment motion now argues that summary judgment is appropriate because: (1) the Act of God defense relieves Home Depot of liability, (2) Home Depot is not liable for the acts of CASCO and Home Depot had no knowledge of any of the alleged defects in its building, (3) there is insufficient evidence to allow a reasonable fact-finder to conclude that any act or omission on the part of Home Depot was a proximate cause of the decedents' deaths, (4) there is insufficient evidence beyond mere surmise or conjecture to show that decedents would have escaped the harm caused by the tornado. Plaintiff counters that the Act of God defense does not apply where there is a negligent actor and, here, Home Depot was a negligent actor because Home Depot "breached [its] duty of care in designing and constructing the Joplin Home Depot building" because "the building failed to meet minimum design standards and Defendants failed to inspect the roof structure's welds." Plaintiff argues Home Depot's negligence caused the decedents' deaths because the building "failed prematurely during the tornado at the exact location of design weakness and missing inspections" and "[i]f the roof diaphragm and walls had lasted longer, Rusty and the children would have had time to get to a survivable area."

After Defendant's motion was fully briefed, the Court allowed an additional period of discovery. The Court held oral arguments on the motion and gave the parties an opportunity to submit post-hearing briefs. The issues are now fully briefed and Defendants' motion for summary judgment is ripe for review.

## II. STANDARD

Summary judgment is proper where, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1359 (8th Cir. 1993). "Where there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate." *Quinn v. St. Louis County*, 653 F.3d 745, 750 (8th Cir. 2011). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets the initial step, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To satisfy this burden, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## III. DISCUSSION

Defendants' motion for summary judgment turns on two disputed issues: (1) whether there is sufficient evidence to show that Home Depot breached a legal duty owed to the decedents, and (2) whether there is sufficient evidence to show that any breach by Home Depot caused the decedents' deaths.[1] Upon review of the evidence and arguments provided, the Court

---

[1] As discussed by the parties, the Act of God defense does not apply where the resulting harm is in some part attributable to the defendant. *See generally Kennedy v. Union Electric Co. of Missouri*, 358 Mo. 504, 216 S.W.2d

Case 3:14-cv-05084-MDH   Document 180   Filed 07/21/16   Page 3 of 29

finds Plaintiff failed to present sufficient evidence to allow a reasonable fact-finder to conclude that Home Depot breached a duty that caused the decedents' deaths.

## A. Undisputed Material Facts

### *Background of the Joplin Tornado*

On Sunday, May 22, 2011, a catastrophic multiple-vex EF-5 tornado with maximum winds speeds over 200 miles per hour struck Joplin, Missouri. The tornado reached a width of nearly three-fourths of a mile during its 22-mile path through the southern part of the city. The Joplin tornado resulted in 161 fatalities, injured more than 1,150 others, caused catastrophic damage to more than 8,000 homes, 500 commercial properties, and 18,000 vehicles, and caused nearly $3 billion in damage. The Joplin tornado is considered the deadliest tornado to hit the United States since 1947, it is ranked seventh among the deadliest tornadoes in United States history, and it is considered the single costliest tornado in United States history.[2]

According to an article in the Natural Hazards Observer, "[o]ne unique aspect of the Joplin tornado was the broad range of building systems it affected." The article explained that "[w]hile most buildings damaged by tornadoes are typically low-rise, marginally or non-

---

756, 763 (Mo.banc 1948) ("When the result in part is ascribable to the participation of man, either through active intervention or neglect or failure to act, 'the whole occurrence is thereby humanized, as it were, and removed from the operation of the rules applicable to the acts of God.'"); *see, e.g., Robinson v. Missouri State Highway & Transp. Comm'n*, 24 S.W.3d 67, 80 (Mo. Ct. App. 2000) ("As such, the fact that the rainstorm on September 22, 1993, was an act of God did not relieve the respondents of their liability for any acts of negligence on their part in constructing and maintaining their levees."). Here, Plaintiff argues the Act of God defense does not apply because Defendants failed to exercise due care prior to the tornado and because Defendants' actions/inactions concurred with the Act of God to cause Plaintiff's injuries. Thus, the Court must decide whether sufficient evidence supports Plaintiff's argument that Home Depot failed to exercise reasonable care and its conduct was a cause of Plaintiff's injuries.

[2] As a point of comparison, about 95% of all tornadoes in the United States are below EF-3 intensity and only about 0.1% of all tornadoes in the United States achieve EF-5 status. The Joplin tornado was the first EF-5 tornado to touch down in Missouri since May 20, 1957 and it was only the second EF-5 tornado in Missouri recordkeeping history. According to the National Oceanic and Atmospheric Administration ("NOAA"), "2011 was an unusually active and deadly year for tornadoes across the U.S. . . . more than any other year on record except for 2004" and May of 2011 "was the deadliest May since 1933." A report completed by FEMA's Mitigation Assessment Team (MAT) following the tornado explained that "the May 22 Joplin, MO, tornado was an isolated occurrence on a day forecasted by the SPC as having only a moderate risk for tornado activity" and "[t]he atmospheric conditions and thunderstorm dynamics rapidly evolved during the afternoon hours to produce a complex interaction of circumstances leading to the Joplin, MO tornado."

engineered buildings like manufactured homes, the Joplin tornado damaged non-engineered and engineered buildings alike." Both the Natural Hazards Observer article and a FEMA Mitigation Assessment Team (MAT) report observed that building code requirements do not require a building to withstand extreme wind events such as an EF-4 or EF-5 tornado. The MAT report stated that even buildings designed and constructed in accordance with applicable building codes in Joplin "experienced failure of the building envelope and structural systems when loaded beyond code parameters."

### *The Decedents*

On May 22, 2011, Edie Housel ate dinner at McAllister's Deli on Rangeline Road in Joplin, Missouri with her husband, Russell Howard, and their two children, Harli Howard, age five, and Hayze Howard, age nineteen months. After they were finished eating, Edie headed to Freeman Hospital, where she was scheduled to work the night shift as a nurse. Edie and Russell spoke on their cell phones at 5:43 p.m. as the tornado sirens were going off. Russell told Edie that he was going inside the Joplin Home Depot store with the children. Russell's truck was found under the canopy in front of the lumbar entrance of the Joplin Home Depot store. The bodies of Russell and his two children were later found under the west wall panel in the southwest corner of the Joplin Home Depot store. Steve Cope testified that he saw the decedents' bodies after the storm passed and the bodies were located at the base of the west wall, just inside the store, in a crouched position. He testified that the decedents' bodies were found near the same vicinity as the body of Dean Wells, a Home Depot Employee, who was located approximately 20 to 30 feet east of the decedents' bodies, closer to the back of the store.

5

### *The Joplin Tornado at the Joplin Home Depot*

As the tornado watches and warnings progressed on May 22, 2011, employees at the Joplin Home Depot store met and monitored the developing weather conditions. When the tornado sirens went off for the first time, the Home Depot store manager sent a page over the intercom for associates and customers to be aware that a weather event was happening. The Home Depot management team conducted a sweep of the building to ensure that all customers were aware that they needed to move to the back of the building to the training room. The management team members then posted to assigned areas of the store to maintain visualization and secure the entrances. Individuals from the area surrounding the store attempted to take refuge inside the Joplin Home Depot store up to the time the tornado struck.

When the weather appeared to worsen, and shortly after the second tornado siren sounded, the store manager sent another page for all associates to go back to the training room and to ensure that all customers were back in the training room. The store manager testified that a short time later he saw a spark at the front entrance, the power went out, and the front glass doors blew in. At that time, the store manager was standing near the registers at the front entrance to the store and he immediately turned and ran in the dark straight to the training room; by the time he arrived at the training room, he stated the roof was coming off the building and the training room walls were leaning such that it was difficult to close the training room door. Home Depot employee Jose Barbosa testified that he was standing near the kitchen and bath area when the store went dark and he felt the ground begin to shake and saw a growing hole in the roof; he stated that he used the flashlight on his phone to try to get back to the training room but he ended up at the women's bathroom, which was no longer there, so he held onto the women's bathroom door until the storm passed. Another Home Depot employee, Joseph Cabalero,

testified that he was running from the front entrance of the store to the training room area when the lights went out; he stated he then hit a beam, ended up in the carpet area where he found an associate and a customer, and then they all found their way back to the training room using a light on the associate's phone. All of the individuals in the training room survived the tornado.

The National Weather Service rated the tornado as an EF-4 or EF-5 in vicinity of the Joplin Home Depot store, the MAT report ranked the tornado as an EF-4 at the location of the Joplin Home Depot store, and a National Institute of Standards and Technology investigation rated the tornado as an EF-3 at the Joplin Home Depot store. A total of eight individuals reportedly perished inside the Joplin Home Depot store during the tornado, including Plaintiff's three family members. Inspections showed that the building failure occurred at the welded connections; specifically, the roof welds came apart, the roofing system was ripped off of the store, and the tilt-in walls collapsed.[3] The parties do not dispute that, due to the strength of the winds associated with the tornado, which exceeded wind speeds required by the Joplin building code, the roof of the Joplin Home Depot store was going to come off at some point during the tornado even if the alleged design and construction flaws did not exist. MSJ Oral Arg. Tr. 38. Plaintiff argues only that the building's destruction would have been delayed had the building not suffered from the alleged flaws.

### *Design and Construction of the Joplin Home Depot*

Home Depot generally delegated to the architects and engineers it hired on a construction project the authority to act on its behalf in the design, construction, code compliance, and coordination of the stores. Home Depot provided its architects and engineers with a specific "prototype" layout for the store, which was a fixture layout including elements such as building

---

[3] The tilt-in walls of the Joplin Home Depot could not stand upright without the roofing system or some other type of shoring or bracing and the building contained no redundancy in the construction for holding up the walls.

7

outline, square footage, floor plan, rack layout, etc., and then the outside architect was responsible for drawing the construction plans around the prototype in light of local codes and terrain. Home Depot had no policies, procedures, or practices regarding in-house assessments on whether stores built in 2000 were designed and built to code other than delegating such responsibility to its hired and licensed architect of record and including a provision in the contract requiring the architect to design the building in accordance with local laws and ordinances. A Home Depot representative further noted that the outside architects and engineers were required to complete inspections throughout construction of the project and that the city would issue a certificate of occupancy to open the store. Home Depot had a construction team that generally oversaw the construction of the stores and was responsible for ensuring the store opened on time and on budget.[4]

CASCO Diversified Corporation ("Casco") prepared the architectural plans and specifications for the design of the Joplin Home Depot store, which was built in the year 2000. The contract between Home Depot and Casco could not be located but the parties agree that a contract existed between Home Depot and Casco and that it contained certain standard conditions. For example, the contract contained a provision stating that before any drawings or designs could be changed they had to be approved by Home Depot; a provision stating that Casco had the authority to act on behalf of Home Depot only to the extent provided in the

_____

[4] The director of the construction team held a bachelor of architecture degree and the project managers held degrees related to the developmental process, including, for example, degrees in construction management, industrial engineering, civil engineering, or architecture. The construction team held developmental meetings every six to eight weeks to discuss the status of various projects, scheduling, budget, and any issues that arose at a particular store. Each meeting covered dozens of projects, not just the Joplin Home Depot project. Other parties present at the meetings included Home Depot's development staff, real estate department, store planning department, and Home Depot's outside attorneys and architects. The construction team made no decisions related to design of the store or, specifically, to roof resistance uplift pressure; such decisions and the responsibility for compliance with local ordinances was delegated to the individual architect and engineers. The project managers would visit the job site every couple of weeks and review the general progress of the project, meaning review the schedule, cost, and quality of the observable product on project – for example, observing a floor slab with cracks running through it.

Case 3:14-cv-05084-MDH   Document 180   Filed 07/21/16   Page 8 of 29

contract; a provision stating that the Home Depot project manager, at all times, had access to Casco's work during preparation and progress of the construction; provisions stating that the Home Depot project manager had the authority to reject work that did not conform to the contract documents, to request special inspection or testing of the work, and to issue change orders; and a provision requiring Casco to design and build the structure in accordance with local laws and ordinances.

Joplin Ordinance No. 97-091 was in effect at the time the Joplin Home Depot store was designed and built and that ordinance adopted the 1996 BOCA National Building Code, with amendments, as the basic building code of the city. After preparing the architectural plans and specifications for the Joplin Home Depot store, Casco submitted the plans to Home Depot and the City of Joplin for review and approval. In addition to drawing the construction plans, Casco was responsible for managing the process of reviewing those plans, putting them out for bid, and doing construction administration. Contractors were required to communicate to Home Depot through Casco because "[Casco] managed the construction administration, and so they are the ones that typically direct the contractor in the work." The City of Joplin issued a building permit for construction of the store on June 13, 2000 and issued a Certificate of Occupancy on November 13, 2000. Casco has had no connection to the Joplin Home Depot since the year 2000.

Home Depot entered into a contract with Anderson Engineering to provide "testing and inspection services during construction" of the Joplin Home Depot project. The scope of testing services to be provided by Anderson Engineering included, among others, "steel inspection" and "other tests and inspections as needed." A pre-roofing conference memorandum shows a representative of Anderson Engineering attended the pre-roofing conference and states that

9

"Anderson will be the Testing and Inspection Agency on this project" and "Inspector to be on Job Site at least once per day and will submit daily report to Contractor, who will distribute to Owner and Architect."  At the meeting, Anderson Engineering was designated as the roof testing and inspection agent.  The Home Depot corporate representative testified that Home Depot hired Anderson Engineering as a special inspector to do steel inspections in 2000 but he had no specific knowledge as to whether the inspections were completed.  Two Casco representatives testified that it was common practice for Home Depot to hire a special inspector for all of its projects, that they could not remember a project where Home Depot did not hire a special inspector, and that, per their records, Anderson Engineering was hired as the special inspector on the Joplin Home Depot project to do testing on the roof and roof connections.  A representative of Anderson Engineering, Seigfried Tarnowieckyi, testified that Anderson Engineering did not perform – and was not asked to perform – steel inspections or weld inspections for the Joplin Home Depot project in 2000; however, he acknowledged in his deposition that he did sign a contract with Home Depot on behalf of Anderson Engineering and that, if steel inspections were within the scope of the services covered under that contract, then Anderson Engineering would have seen that the steel inspections were completed.  An affidavit from a corporate representative of Anderson Engineering states that, according to his investigation and review of documents, Anderson did not perform any inspections on the welds, the roof, the roof materials, or the roof support connections.[5]  Neither Home Depot nor Casco retained any reports from Anderson Engineering, if they ever existed, regarding steel inspections or roof inspections.[6]

---

[5] The Anderson Engineering corporate representative agreed that certain documents related to the Joplin Home Depot project may no longer be available due to the passage of time.

[6] The Casco corporate representative testified that any special inspections reports for the Joplin Home Depot project would have been discarded by the Casco due to its policy on retention and purging of documents.  The Home Depot corporate representative testified that at least some of the documents pertaining to the Joplin project were

## B. Arguments

Plaintiff argues that Home Depot breached its duty of care to the decedents, as invitees, because the Joplin Home Depot store was negligently designed and constructed and Home Depot knew its building was negligently designed and constructed. Citing the expert report of her structural engineer, Plaintiff argues the Joplin Home Depot building failed to comply with Joplin Ordinance 97-091 notwithstanding issuance of the Certificate of Occupancy in that the roof was not designed and constructed to withstand the required wind speeds. Plaintiff claims the building failed prematurely due to joist seat weld failures and five specific design and/or construction errors increased the likelihood of the joist seat weld failures: (1) the design engineer failed to reduce the deadload, or weight of the roof, when calculating uplift, (2) the design engineer failed to account for increased uplift forces at the roof perimeter, (3) the design engineer failed to specify an axial tie load when designing the joist seats, (4) the design engineer designed the building diaphragm for the wrong wind exposure classification, and (5) failure to inspect the welds at the time of construction or, in other words, the assurance of quality control was missing.

Home Depot denies the design failures but also argues that it cannot be held legally liable for the alleged professional negligence of independent contractors such as its outside architects, engineers, and builders. It argues that the acts and omissions of the original designers and builders cannot be imputed to Home Depot. Home Depot argues that summary judgment is appropriate because Plaintiff has failed to present any actual evidence that Home Depot was negligent or had knowledge of the alleged design failures.

Plaintiff contends the acts/omissions of the architect and engineering companies engaged by Home Depot were constructively the acts/omissions of Home Depot based on an agency

unintentionally destroyed as the result of a sprinkler malfunction. Metzger Construction, the general contractor on the Joplin Home Depot project, stated it no longer has any documents related to the Joplin Home Depot project.

theory and "[i]n the case of an owner who created the dangerous condition himself or through an agent, knowledge is imputed to him."[7]  Plaintiff asserts that an agency relationship existed between Home Depot and Casco, that roof strength was within the scope and course of Casco's agency, and that Casco's creation of and knowledge regarding the dangerous condition can therefore be imputed to Home Depot.  Plaintiff further argues that "Home Depot is liable for the negligent design and construction even if it says it didn't know the design was deficient" because "there are three situations where knowledge of the defect or danger is not a necessary element of negligence" such as where "the act or omission, in and of itself, involves a violation of a duty, as in a case of violation of a statute or ordinance, in jurisdictions such as our Missouri where this is regarded as negligence per se[,]" citing *Monsour v. Excelsior Tobacco Co.*, 115 S.W.2d 219, 223 (Mo. Ct. App. 1938).  Additionally, Plaintiff argues that "[w]hen Home Depot, individually and through its agents, accepted the completed design and building, Home Depot became the proximate cause of the persisting defects in the building[.]"  Home Depot responds that "Missouri law does not permit the imputation of professional architectural standards of care to a lay entity such as Home Depot" and "the knowledge of an independent contractor or building designer cannot be imputed to a premises owner in a situation involving a latent construction defect."  Home Depot argues that "despite months of additional discovery and scores of depositions, Plaintiff has still been unable to produce a single piece of evidence of Home Depot's own negligence, or actual or constructive awareness of any alleged negligence of the design engineers of the building."

---

[7] Plaintiff argues the relationship between Home Depot and Casco was more than a typical subcontractor relationship, citing the following specific facts: Home Depot is a sophisticated party, the head of Home Depot's construction department has an architectural degree and others in the department have civil engineering degrees and construction management degrees, Home Depot provided Casco with a building footprint, Home Depot had the authority to redo Casco's work, Casco was hired as a "go-between" between the subcontractor and Home Depot, and Home Depot hired Casco to "take on the role of project management."

Plaintiff further responds that Home Depot knew or should have known of the alleged construction-related defects in the roof welds because Home Depot failed to inspect the welds during construction as required by the local code and industry best practices. Plaintiff argues Casco's design plan, the applicable building codes, and industry best practices all required special inspection of structural welding conducted in the field yet there is no evidence that the roof welds on the Joplin Home Depot building were ever inspected. At oral argument, Home Depot responded to that argument as follows:

> [T]he city of Joplin required that an independent -- so you have CASCO, the engineering firm that designs it, you have Metzger that builds it, and there's one provision in the Joplin code that says as to the welds, an independent inspector shall be hired to conduct some random inspection of a certain -- an unspecified percentage of thousands of welds.
>
> So here's what happened. Home Depot -- and the contract's in the record but I can pull it up on the PowerPoint -- hired Joplin based Anderson Engineering Company to perform these inspections. That's undisputed. So now 15 years later we're in a lawsuit. Plaintiff subpoenas Anderson. Anderson went through three different productions which it said we've produced all the records that we could find. Each time we find more records, we find more records, we find more records. Last deposition of Anderson they say, There's probably some more but we can't find them. We cannot find the record of this inspection. Metzger has no records at all. CASCO had a water intrusion event so they only had a fraction of their file. Home Depot only had a fraction of its file.
>
> . . .
>
> [Plaintiff's] argument is that because there -- because no one's located a record of the inspections, all we have is the contract, that means, A, the inspections weren't done, that means, B, if they had inspected 5 percent of the welds, they would have found defects in those welds, C, the defects would have been sufficient to compromise the overall integrity of the roof in whatever unspecified location these would have been found; and E -- or whatever I'm on -- that somehow results in the failure of the roof when their main theory is that the engineer under-designed the roof and it supposedly failed at a wind speed below code levels. So it's a stacking of several inferences on each other.

MSJ Oral Arg. Tr. 32-34. Home Depot further noted that the City of Joplin's "own requirements required it to perform that inspection as well and not to issue a certificate of occupancy until it confirmed that the independent inspection was done and its own inspections satisfied itself that

the roof was fine" and, here, the City of Joplin issued a certificate of occupancy. *Id.* at 59. Plaintiff responds that both Anderson Engineering and the City of Joplin had other reports of inspections done by Anderson Engineering in their files yet no record of the weld inspections at issue here and, moreover, the evidence shows more than a lack of records because Anderson Engineering submitted an affidavit stating that the company never performed any roof weld testing or structural weld testing on the Joplin Home Depot store and Seigfried Tarnowieckyi testified that he would have been the person to do such inspections on behalf of Anderson Engineering and he never did them.

As an additional ground for summary judgment, Home Depot argues that Plaintiff has failed to present sufficient evidence to show that any alleged negligence on the part of Home Depot impacted the decedents' chances of survival. Home Depot argues that Plaintiff has failed to present evidence to show the exact time that the decedents entered the store, what the decedents did upon entering the store, the exact time the tornado hit the store or at what speeds, the additional length of time the store would have remained standing had the store been designed and built according to Plaintiff's allegations, and/or where the decedents would have gone in their extra seconds and their probable chance of survival at that location.

Plaintiff argues that causation is a factual question which can be built upon inferences and that there is sufficient evidence here to submit the issue of causation to the jury, citing to *Stith v. St. Louis Public Service Co.*, 363 Mo. 442, 449 (1952). Plaintiff argues the evidence shows the decedents would have had an additional 30 seconds to 2 minutes to clear the "crush zone" had the building met code requirements. Plaintiff cites various expert reports and testimony to support that proposition. Lombardo, a wind expert, provided an estimate of wind speed and direction time histories of the tornado at the Joplin Home Depot store. Lawson, a

structural engineer, opined that the five failures identified by Plaintiff contributed to the premature collapse of the building. Marshall, an engineer and meteorologist, opined that roof damage at the Home Depot began at approximately 103 miles per hour, 3-second gust, followed by failure of the roof decking and then failure of the roof structure at 134 miles per hour, 3-second gust. Lawson opined that a building built to code should have withstood winds up to 116 miles per hour, 3-second gust. Gallus, an expert in meteorology, opined that various assumptions used in Lombardo's model could vary the timing results significantly and, depending on the transitional speed of the tornado used and the type of vortex model used, the wind speed at the Joplin Home Depot store could have increased from 80 miles per hour to 116 miles per hour in less than 10 seconds, in 15 to 18 seconds as determined by Lombardo, or in up to 20, 30, or 40 seconds. Plaintiff further argues the evidence shows the decedents only had to travel 20 to 30 feet in order to get to a survivable area. To support that proposition, Plaintiff cites the testimony of structural engineer Lawson who stated he believes a person had a "good chance" of surviving beyond the crush zone of the west wall, "good meaning more than 50 percent[,]" and pointed to the space between the shelving racks as a survivable area. Plaintiff further cites the fact that Dean Wells' body was found near the decedents' bodies as evidence from which the jury could infer that Mr. Wells was ushering the decedents to the training room and the fact that three other employees survived while running through the store as evidence from which the jury could infer that the decedents would have survived.

Home Depot responds that the expert testimony cited by Plaintiff is insufficient to establish causation. Home Depot highlights that Lombardo admitted during his deposition that the base line timing estimates he used to determine when the tornado struck the Joplin Home Depo store were not based on actual scientific analysis or methodology and Lombardo admitted

his timings could be "off" by up to a minute and a half.  Home Depot notes that Lombardo's opinion is based on the Rankin vortex model which assumes a steady, solid body rotation which does not match the tornado at issue here.  Additionally, Home Depot highlights that, while Lawson opined the Home Depot building failed prematurely, Lawson never provided an opinion as to how much sooner the building failed based on all of the alleged design and construction defects, let alone any defect in particular.  Home Depot further argues that the evidence shows the speed of the winds at the Joplin Home Depot store increased well beyond the speed cited by Plaintiff for acceptable failure within a matter of seconds, that multiple other individuals in the store perished as well, and that the decedents' bodies were found in a crouched position indicating they were not traveling to a "survivable area" at the time they perished.

## C. Analysis

### 1. Home Depot's Legal Duty

In this negligence action, Home Depot will be liable only if it is determined that Home Depot's conduct fell below the standard of care established by law for the protection of others and such conduct was the proximate cause of Plaintiff's injuries.  *Harris v. Niehaus*, 857 S.W.2d 222, 225 (Mo. 1993).  "The particular standard of care that society recognizes as applicable under a given set of facts is a question of law for the courts" and "[w]hether a defendant's conduct falls short of the standard of care is a question of fact for the jury."  *Id.*  "The Court will not, however, submit a case to the jury where no evidence exists to support a finding that defendant's conduct fell below the identified standard of care."  *Id.*

Here, Plaintiff asserts a negligence cause of action based on premises liability.  The Court assumes for purposes of this motion that Plaintiff's decedents were invitees at the time they

entered the Joplin Home Depot store.[8]  The standard of care owed by a possessor of land to an

invitee on its premises is a duty "to use reasonable and ordinary care to prevent injury to the

invitee as the result of a dangerous condition existing on the premises."  *Griffith v. Dominic*, 254

S.W.3d 195, 198 (Mo. Ct. App. 2008).  To hold a possessor of land liable, an invitee must show:

> (1) a dangerous condition existed on defendant's premises which involved an
> unreasonable risk; (2) the defendant knew or by using ordinary care should have
> known of the condition; (3) the defendant failed to use ordinary care in removing
> or warning of the danger; and (4) the plaintiff sustained injuries as a result of such
> condition. *Burns v. Frontier II Properties, Ltd. Part.*, 106 S.W.3d 1, 3 (Mo. App.
> 2000); *see also Emery v. Wal–Mart Stores*, 976 S.W.2d 439, 443–44 (Mo. banc
> 1998).

*Steward v. Baywood Villages Condo. Ass'n*, 134 S.W.3d 679, 682 (Mo. Ct. App. 2004).  As one

Missouri court explained:

> [A] possessor is not held liable for an injury caused by a defect in the premises of
> which he had no actual knowledge, even though it might have been revealed if he
> had made an investigation or inspection, unless the situation suggests an
> investigation and the facts are such as to indicate to a reasonably prudent man the
> likelihood of the existence of some hidden danger to persons lawfully on his
> property.

*Medows v. Brockmeier*, 863 S.W.2d 675, 676-77 (Mo. Ct. App. 1993).

To prevail on her negligence claim, Plaintiff must further show that Home Depot's

alleged breach was the cause of the decedents' deaths.  *See Robinson v. Missouri State Highway

& Transp. Comm'n*, 24 S.W.3d 67, 77 (Mo. Ct. App. 2000).  "[T]o prove a causal connection to

establish negligence, the plaintiff must show both causation in fact and proximate causation."  *Id.*

Causation in fact exists where the plaintiff's injuries would not have occurred but for the

defendant's breach.  *Id.*  To establish causation in fact, "the plaintiff must show the defendant's

---

[8] Plaintiff argues the decedents were invitees because they were there to buy shutters whereas Home Depot argues
the decedents were licensees.  *See generally Carter v. Kinney*, 896 S.W.2d 926 (Mo. 1995) (discussing classes of
plaintiffs in premises liability actions and declining to abolish the distinction between licensees and invitees).  For
purposes of this motion, the Court will assume the decedents were invitees such that Home Depot would be held to
the higher standard of care.

17

negligent conduct more probably than not was a cause of the injury." *Thomas v. McKeever's Enterprises Inc.*, 388 S.W.3d 206, 212 (Mo. Ct. App. 2012) (quoting *Wagner v. Bondex Int'l, Inc.*, 368 S.W.3d 340, 350 (Mo. Ct. App. 2012)). Proximate causation asks whether, in hindsight, the plaintiff's injury can be considered the "natural and probable consequence" of the defendant's negligence. *Robinson*, 24 S.W.3d at 78. The trier of fact normally decides causation. *Id.* at 77. "It is wholly permissible for the jury to infer causation from the circumstances" and "[i]f the logical conclusion from the evidence is that if certain things had been done [then] certain results would not have occurred, and such results did occur, the evidence of causation is sufficient." *Freight House Lofts Condo Ass'n v. VSI Meter Servs., Inc.*, 402 S.W.3d 586, 599 (Mo. Ct. App. 2013).

**2. Plaintiff has presented insufficient evidence to show Home Depot's conduct fell below the establish standard of care as to the alleged design defects.**

Plaintiff has presented insufficient evidence to allow a reasonable fact-finder to conclude that Home Depot knew or should have known of the alleged design defects in the Joplin Home Depot store. The evidence shows that Home Depot contracted with Casco to provide architectural services on the Joplin Home Depot project and the parties' contract required Casco to comply with all local codes and ordinances in designing the building. The alleged design defects cited by Plaintiff all involve purported non-compliance with local codes and/or professional engineering standards. Even assuming Casco made the alleged errors in calculating roof uplift and wind resistance, Plaintiff has presented no evidence to show that Home Depot knew of such errors or understood the complex calculations performed by its third-party architect.[9] Although Plaintiff argues Home Depot knew of the alleged defects through its

---

[9] Plaintiff initially argued Home Depot had actual knowledge of the alleged defects based on Home Depot's uncontroverted material fact related to emergency plan procedures. The evidence shows that Home Depot had a

18

"approval" and "acceptance" of Casco's work, there is no evidence to suggest that Home Depot researched the local ordinances and building codes applicable to each architectural element of the building and reworked each of the calculations done by its professional architect to assure accuracy in order to have knowledge of the alleged defects.[10] Even Plaintiff's structural engineer admitted that "[t]he owner has to rely on his experts or his consultants to do their job properly." Lawson Depo, at 84. The fact that Home Depot is a "sophisticated" party does not alone provide evidence to infer that Home Depot had such knowledge.[11] Moreover, the alleged design defects are not the type a building owner would likely discern absent a catastrophic event such as a powerful tornado. In sum, Plaintiff has pointed to no specific evidence tending to show that

---

procedure in place to close all doors in emergency situations. The fact that FEMA stated in its report that the doors were shut and locked "in an attempt to secure the building and reduce the risk of inflow of air" does not infer that Home Depot actually shut the doors to "reduce the risk of inflow of air" or otherwise infer that Home Depot had knowledge of the specific roof defects alleged by Plaintiff. Plaintiff appears to have abandoned this argument in supplemental and post-hearing briefing.

[10] As explained by Defendant during oral arguments:

> Now, as in any job, a contract provides that the architect, engineer is to furnish the plans to the owner prior to final approval. There's no evidence that Home Depot understood anything about these plans much less with respect to a complex structural engineering calculation related to net wind uplift resistance as it relates to the fabrication of joists and joist girders.

MSJ Oral Arg. Tr. 15.

[11] Plaintiff cites to *Thompson v. Higginbotham*, 187 S.W.3d 3 (Mo. Ct. App. 2006) to support the proposition that a different standard of care applies to a sophisticated party. In *Thompson*, the issue presented was whether the circuit court erred in granting summary judgment to defendants under the ten-year statute of repose. *Id.* at 4. The court found summary judgment was inappropriate because the defendants in that case, the O'Rileys, were the designers, planners, and builders on the project as well as the property owners and vendors, such that the record contained sufficient facts showing the O'Rileys had a connection to the unsafe/defective condition potentially giving rise to liability other than as a designer/builder and, therefore, the state of repose did not apply. *Id.* at 6-10. In finding potential liability of the O'Rileys as vendors, the court discussed the duty of vendors to disclose known dangerous conditions to vendees, noting such a duty "foster[s] greater openness and candor in real estate transactions." The court found the O'Rileys, as vendors, were also "allegedly sophisticated, knowledgeable, and experienced builders" who may have had reason to know of the dangerous condition whereas the vendees were a college professor and a dentist who may have had reason to believe "that apartments with balconies, recently constructed and sold to them by experienced construction professionals, were in a safe condition." *Id.* at 8-9.

Here, Home Depot was not the designer, planner, and builder of the Joplin Home Depot store and Home Depot did not instruct Casco how to design or build the roof; rather, Home Depot hired an independent third-party professional architect to design its building to ensure compliance with local codes. Additionally, the building was not recently constructed as in the *Higginbothom* case, and the alleged duty on the part of Home Depot arises from its status as possessor of land, not vendor of land.

19

Home Depot knew or should have known of the alleged design defects either at the time of construction or at any point during the eleven-year period between completion of construction and the Joplin tornado.

Plaintiff argues that Home Depot is liable for the work of its third-party architects and engineers pursuant to the acceptance doctrine. The acceptance doctrine "is often described as an affirmative defense" and "absolves contractors of liability to third parties once the owner accepts the contractor's work as being in full compliance with the terms of the contract." *Dick v. Children's Mercy Hosp.*, 140 S.W.3d 131, 140 (Mo. Ct. App. 2004). Missouri courts have been hesitant to allow offensive use of the acceptance doctrine to impute the negligence of a contractor to an owner. *Id.* at 139-41.[12] As discussed by one Missouri court:

> The acceptance doctrine, as delineated by the respondent, is a theory of strict liability, because no matter how careful the owner is in selecting or monitoring a contractor, the owner is automatically saddled with the contractors [sic] negligent performance upon acceptance of the contractors work. If, as in this case, the contractor is an independent contractor, the Supreme Court has held that the owner is only strictly liable when the contractors negligence pertains to the owners non-delegable duties (e.g., for inherently dangerous activities). *Matteuzzi v. Columbus P'ship., L.P.*, 866 S.W.2d 128, 130–31 (Mo. banc 1993). *Accord Scott v. Edwards Transp. Co.*, 889 S.W.2d 144, 146 (Mo. App. 1994) ("[A] landowner has never been liable for bodily harm caused by the torts of an independent contractor unless the contractor's activity was inherently dangerous.").

*Id.* at 140-41. For the reasons discussed in *Dick*, the Court rejects Plaintiff's attempted offensive use of the acceptance doctrine as a means to absolve Plaintiff of having to prove the "known or should have known" element of her negligence claim.[13]

---

[12] The cases cited by Plaintiff all involve defensive use of the acceptance doctrine. *Becker v. Setien*, 904 S.W.2d 338, 343-45 (Mo. Ct. App. 1995); *Roskowske v. Iron Mountain Forge Corp.*, 897 S.W.2d 67, 71 (Mo. Ct. App. 1995); *Coleman v. City of Kansas City, Mo.*, 859 S.W.2d 141, 145 (Mo. Ct. App. 1993); *Gast v. Shell Oil Co.*, 819 S.W.2d 367, 370-71 (Mo. 1991); *Casey v. Hoover*, 114 Mo. App. 47, 89 S.W. 330, 335 (1905).

[13] Plaintiff cites the following language from a 1905 Missouri appellate court case as providing support for her imputed negligence and/or imputed knowledge argument based on the acceptance doctrine:

Plaintiff further argues that Casco's knowledge of the alleged defects can be imputed to Home Depot because Casco was an agent of Home Depot and because the alleged design defects were created by Casco within the scope of Casco's agency. The proposition furthered by Plaintiff – that knowledge of a dangerous condition on the premises can be imputed to the possessor if the possessor's agent created or was aware of the dangerous condition – is supported in a narrow line of Missouri slip-and-fall cases. *See generally Breckenridge v. Meierhoffer-Fleeman Funeral Home, Inc.*, 941 S.W.2d 609, 611-13 (Mo. Ct. App. 1997). However, Plaintiff cites no authority extending such a proposition to cases involving a third-party architect and a latent design or construction defect. To hold that an owner of property has actual knowledge of any and all latent structural defects completed by its third-party architect in its professional capacity, including the architect's failure to comply with local codes and use correct formulas in its design calculations, simply because the independent contractor also served some agent-type function for the owner, surely seems unjust. *See generally Parshall v. Buetzer*, 195 S.W.3d 515, 520 n. 5 (Mo. Ct. App. 2006) (citing Restatement (Second) of Agency § 2 (1958)) (noting the terms "independent contractor" and "agent" are not mutually exclusive). A property owner who hires outside expertise in architecture and engineering should be able to rely on their work absent specific knowledge of the insufficiency of their work product. Based on the law and evidence

It is the intervening negligence of the proprietor that is the proximate cause, and not the original negligence of the contractor. By occupying and resuming possession of the work, the owner deprives the contractor of all opportunity to rectify his wrong. Before accepting the work as being in full compliance with the terms of the contract, he is presumed to have made a reasonably careful inspection thereof, and to know of its defects, and, if he takes it in the defective condition, he accepts the defects and the negligence that caused them as his own, and thereafter stands forth as their author.

*Casey*, 89 S.W. at 334. However, when faced with the same citation and a similar argument, the Missouri Court of Appeals for the Western District rejected Plaintiff's position, explaining that: (1) *Casey* treated the acceptance doctrine as a separate cause of action and not as a basis for excusing the plaintiff from having to prove the knowledge element of a premises liability action, (2) the language quoted was dictum because it was completely unnecessary to decide the case before it, which involved defense use of the acceptance doctrine, and (3) even if the rationale in *Casey* were binding, the court would be constitutionally bound to ignore it because it is inconsistent with recent Supreme Court precedent. *Dick*, 140 S.W.3d 140.

presented, the Court finds Plaintiff has failed to demonstrate facts from which it could reasonably be concluded that Home Depot had imputed knowledge of a dangerous condition through Casco's creation of, or knowledge regarding, the alleged design defects.

Finally, Plaintiff argues that "knowledge of the defect or danger is not a necessary element of negligence where the act or omission, in itself, involves violation of a duty." Plaintiff cites to *Monsour v. Excelsior Tobacco Co.*, 115 S.W.2d 219, 223 (Mo. Ct. App. 1938) for the proposition that Home Depot's alleged failure to comply with a local ordinance is evidence of negligence in itself such that Plaintiff is not required to prove Home Depot had knowledge of the alleged dangerous condition. The Court rejects Plaintiff's argument. First, the Court notes that Plaintiff has not pleaded negligence per se against Home Depot. Second, under Missouri case law, even a plaintiff in a premises liability action based on a theory of negligence per se arising from the alleged violation of a local ordinance must still prove the defendant had actual or constructive knowledge of the alleged defect.[14] Third, Casco rather than Home Depot would be the entity that violated the applicable building codes; Plaintiff has presented no authority to impute responsibility for a professional subcontractor's violation of a local ordinance to the landowner without requiring any knowledge on the part of the landowner, especially where, as here, the landowner's contract explicitly states that the subcontractor must comply with local

---

[14] *See Burns v. Frontier II Properties Ltd. P'ship*, 106 S.W.3d 1, 3-4 (Mo. Ct. App. 2003) (holding that plaintiff who brought negligence per se claim arising from the violation of a local ordinance adopting BOCA was still required to prove the landowner had notice of the alleged defect); *see also* 34 Mo. Prac., Personal Injury and Torts Handbook § 36:13 (2015 ed.) (citing *Burns* and stating that "in cases of invitees, the element of actual or constructive notice to the owner of the condition of the property must be included even in negligence *per se* submissions"). Moreover, Missouri courts are clear that where negligence per se is based on the violation of a local ordinance rather than the violation of a statute, the ordinance must be consistent with the common law. *See id.* at 4 n. 2; *McKinney v. H.M.K.G. & C., Inc.*, 123 S.W.3d 274, 278 (Mo. Ct. App. 2003) (citing *Mediq PRN Life Support Servs., Inc. v. Abrams*, 899 S.W.2d 101, 110 (Mo. Ct. App. 1994)). Under common law, an owner of land can be held liable for physical harm caused by latent defects on the land only where the landowner knew or should have known of the alleged latent defect. *See Medows v. Brockmeier*, 863 S.W.2d 675, 676 (Mo. Ct. App. 1993).

22

codes and ordinances.[15]  For the foregoing reasons, *Monsour* is distinguishable and Plaintiff's argument is rejected.

### 3. Plaintiff has presented insufficient evidence to show that Home Depot's conduct fell below the establish standard of care as to the roof weld inspections.

The Court finds summary judgment is also appropriate on Plaintiff's claim that Home Depot breached its duty to the decedents by failing to inspect roof welds as required by local code and industry best practices.  Plaintiff argues Home Depot had a duty to hire a special inspector to inspect the roof weld connections during construction of the Joplin Home Depot store.  Plaintiff argues that if such inspections would have been performed then a defect in the welds would likely have been found.  The evidence shows that Home Depot's usual practice was to hire special inspectors on every project and that Home Depot contracted with Anderson Engineering to do steel inspections and "other tests and inspections as needed" for the Joplin Home Depot project.  The evidence shows that a representative from Anderson Engineering attended the pre-roof conference during which Anderson Engineering was designated as the roof testing and inspection agent.  The evidence shows that the City of Joplin issued a certificate of occupancy, which is evidence that the code requirements – including the need to hire a special inspector – were met.

Plaintiff cites Seigfried Tarnoweickyi of Anderson Engineering who testified that Anderson Engineering did not perform weld inspections or steel inspections for the Joplin Home Depot project in 2000 or perform roof inspections for any project in the 2000 time frame.  The documentary evidence, however, shows that a contract did exist and that Mr. Tarnoweickyi, the

---

[15] Case law suggests, to the contrary, that Plaintiff is still required to prove actual or constructive notice in such circumstances.  *See generally Abrams*, 899 S.W.2d at 111 (holding plaintiff failed to make a submissible case against landlord for negligence based on violation of a local ordinance because a "the Nievas, not [the landlord], violated these provisions of the Code" and "[t]here is no evidence that [the landlord] actually knew [i.e. had notice, actual or constructive] of the [latent] defective condition in the electrical system").

person who signed the contract with Home Depot on behalf of Anderson Engineering, attended the pre-roof conference on behalf of Anderson Engineering. Mr. Tarnoweickyi went on to testify that if steel inspections were within the scope of Anderson Engineering's services then Anderson Engineering would have seen that such inspections were completed.

The only other evidence cited by Plaintiff to support her position that Home Depot failed to hire a special inspector is a lack of special inspection reports in the parties' files fifteen years after the building was completed, which Defendant attributes to lapse of time, unintended destruction, and document retention policies.[16] Even assuming Home Depot never received a copy of special inspection reports, as suggested by Plaintiff, such does not necessarily imply that the special inspections were not performed, that Home Depot violated its duty to hire a special inspector, or that Home Depot knew or should have known of any alleged deficiencies in the roof welds if such deficiencies actually existed. According to the pre-roofing conference document, Anderson was required to submit daily inspection reports to the general contractor who in turn would distribute them to the owner and architect. The records of all three of those entities have been compromised since construction. The Court finds Plaintiff has presented insufficient evidence such that a reasonable fact-finder could conclude that Home Depot's conduct breached the identified standard of care.

**4. Even assuming Plaintiff presented sufficient evidence to create a jury question on whether Home Depot's conduct fell below the establish standard of care as to roof**

---

[16] As noted by Home Depot, such reports were not sought until 15 years after the construction was completed, the general contractor on the project, Metzger Construction, stated that it could not locate any documents related to the Joplin Home Depot project, the corporate representative for Anderson Engineering testified that there are documents concerning the Joplin Home Depot store that are no longer in Anderson's files, the corporate representative for Casco testified that many of the documents from the Joplin Home Depot project are no longer in existence because they were destroyed or purged as a part of their document retention policy, and Home Depot's corporate representative testified that a sprinkler malfunction caused numerous Joplin Home Depot store construction records to be destroyed prior to this litigation.

**weld inspections, Plaintiff presented insufficient evidence to show that Home Depot's conduct regarding the roof weld inspections caused the decedents' deaths.**

Even assuming there is a jury question regarding whether Home Depot breached its duty to hire a special inspector to inspect the roof welds during construction of the Joplin Home Depot store, Plaintiff presented insufficient evidence to allow a reasonable fact-finder to conclude that Home Depot's alleged negligence caused the decedents' deaths. *See generally Freight House Lofts Condo Ass'n v. VSI Meter Servs., Inc.*, 402 S.W.3d 586, 599 (Mo. Ct. App. 2013) (causation in fact is an issue for the jury where "sufficient evidence is presented from which the jury could reasonably find that the plaintiff's injury was a direct result of the defendant's negligence" and proximate causation is an issue for the jury where "substantial evidence is presented that shows the injury is a natural and probable consequence of the defendant's negligence"). Here, Plaintiff's evidence is woefully inadequate such that no reasonable juror could conclude – outside of speculation or conjecture – that Home Depot's failure to inspect the roof welds caused the decedents' deaths. *See Mediq PRN Life Support Servs., Inc. v. Abrams*, 899 S.W.2d 101, 107 (Mo. Ct. App. 1994) ("[a] finding essential to recovery may be proved by circumstantial evidence" but "the established circumstances must be such that the facts necessary to support the finding may be inferred and reasonably must follow [and] the existence of such facts cannot depend on guesswork, conjecture or speculation"). Plaintiff's evidence is inadequate for the following reasons.

First, Plaintiff presented no evidence regarding the number of welds that were required to be inspected by the special inspector,[17] the likelihood that the special inspector would have observed a weld failure upon inspection, the number of deficient welds commonly found by

---

[17] Plaintiff's structural engineer admitted during his deposition that he did not know the percentage of the total number of welds that were required to be inspected during special inspections. Lawson Depo, at 129-130.

special inspectors or likely to be found by a special inspector, or the number or location of deficient welds necessary to compromise the structural integrity of the roof given the wind strength and direction faced on May 22, 2011. Plaintiff's structural engineer simply opined that "the welds that are being critically loaded here are of such nature that they require special consideration, and a lot of times I find that consideration is only given when there is supervision" and "I have less confidence that [the welds] were done properly if there was no inspection." Lawson Depo, at 124, 129. Plaintiff's structural engineer opined that the failure to inspect roof welds would "directly increase the likelihood" of premature joist seat weld failures but he did not indicate how much more likely premature joist seat weld failure was in this instance based on the alleged failure to inspect the welds during construction. "[E]xpert testimony used to establish causation is of no probative value and is insufficient to make a submissible case if it merely points out that defendant's negligence was a possible factor or was extremely likely to have had a causal effect." *Abrams*, 899 S.W.2d at 107 (citing *Shackelford v. West Central Electric Cooperative, Inc*., 674 S.W.2d 58, 62 (Mo. App. 1984)).

Second, Plaintiff presented no reliable evidence to show how much sooner the Joplin Home Depot store collapsed based on Home Depot's alleged failure to assure quality control of the welds. Even the evidence currently in the record as to how much sooner the Joplin Home Depot store might have failed based on *all* of the alleged design and construction errors[18] is piecemeal, speculative, premised on numerous questionable assumptions, and subject to wide ranges of error.[19] Plaintiff's structural engineer opined that the Joplin Home Depot building

---

[18] Not just any weakness or inadequacy of the roof welds due to the failure to inspect.

[19] For example, as discussed above, Plaintiff's wind expert admitted that his approach used "an overly simplistic representation of how the winds actually behave in a tornado like this one" and "we didn't account [for] vertical wind speeds." Lombardo Depo, at 114-115. Even setting that aside, Lombardo's time estimates contain a margin of error of up to 90 to 100 seconds, Lombardo Depo, at 39-40, and Gallus, whose testimony was cited by Plaintiff,

failed "sooner" by virtue of all five deficiencies but he did not have "any opinion at all" as to how much sooner.  Lawson Depo, at 145-146.  Plaintiff argues the evidence, taken from various different sources, shows that the roof failed "30 seconds to a minute to two minutes" sooner than it should have based on all five alleged failures.   Oral Arg. Tr. 38.[20]   However, Plaintiff presented no evidence to show that the roof failure could or would have occurred because of vulnerabilities arising from failure to inspect the roof welds alone and Plaintiff presented no evidence as to how much sooner the roof failure occurred because of any vulnerability based on failure to inspect the roof welds alone.  Without any evidence concerning the specific amount of time the building would have withstood the tornado longer if welds had been inspected by a special inspector, the jury is unable to reasonably infer that the decedents would have survived the tornado but for Home Depot's alleged failure to inspect the welds.

Finally, and perhaps most importantly, there is no evidence in the record to indicate at what time the decedents entered the store, the condition of the store when the decedents entered, what action the decedents took upon entering the store, whether they could see when they entered the store, or whether there was a survivable area to which they could have feasibly traveled once inside the store.  The only evidence in the record as to the whereabouts and actions of Plaintiff's decedents shows that: (1) the decedents were still outside the store at 5:43 p.m. and, at that time, Russell intended to take the two children – ages five and nineteen months – into the store, and (2) after the building collapsed the decedents bodies were found in a hunched position

---

testified that the wind speed at the Joplin Home Depot store could have increased from 80 miles per hour to 116 miles per hour in less than 10 seconds or in up to 40 seconds.

[20] To support that conclusion, Plaintiff cites various wind speed estimates and timing estimates from several different sources, as well as photographic evidence of roof debris, in order to piece together at what time the roof "failed"; she cites timing estimates of peak wind speed in order to establish at what time the building should have failed.  MSJ Oral Arg. Tr. 38.  Plaintiff's inference that the building should not have failed until it was hit by the strongest winds in the tornado, which were well beyond code-level requirements, is not supported by any authority or expert opinion cited in the record.

underneath the west wall panel in the southwest corner of the store near the base of the wall just inside the store in the same general vicinity as a Home Depot employee. To infer from that evidence that the decedents would have made it to a "survivable area" if they had an additional thirty or sixty seconds – even assuming those estimates are supported by some factual evidence – relies on nothing more than speculation and conjecture. Russell Howard was in an impossible position trying to care for a five year old and a nineteen month old as a powerful tornado struck, entering a building without power and with a roof that either had or was about to come off. A decision to crouch down just inside the building rather than try to go to the back of the store with debris falling would not be unreasonable or unexpected. To argue that he knew which part of the building would be more safe and that he would have arrived there through a dark store with his two young children safely is pure speculation. Five other occupants of the building also failed to identify and reach a place in the building to allow them to survive the tornado.

In sum, the Court finds there is insufficient evidence in the record to allow a reasonable juror to conclude that Home Depot's alleged failure to ensure inspection of the roof welds was "more probably than not" a cause of the decedents' deaths and the decedents' deaths were the "natural and probable consequence" of the Home Depot's alleged failure to ensure inspection of the roof welds. While Plaintiff may rely on inferences to show causation, the inferences in this case are deeply stacked and rely on speculation rather than factual foundation such that the ultimate conclusion reached by Plaintiff "is too remote and has no logical foundation in fact." *See generally Abrams*, 899 S.W.2d at 107 (while "any number of inferences may be drawn in a given case provided that each inference has its own factual foundation" the rule against stacking inferences is "to guard against attenuated reasoning, as where an initial inference is drawn from a

fact, and other inferences are built solely and cumulatively upon the first, so that the conclusion reached is too remote and has no sound logical foundation in fact.").

## IV.  DECISION

Based on the foregoing, the Court hereby **GRANTS** Defendants' Motion for Summary Judgment (Doc. 42) and judgment is entered in favor of Defendants and against Plaintiff on all remaining claims.  All other motions are **DENIED AS MOOT**.


**IT IS SO ORDERED.**

Date:   July 21, 2016                                     ___*/s/ Douglas Harpool*_____
                                                          **DOUGLAS HARPOOL**
                                                          **UNITED STATES DISTRICT JUDGE**

Case 3:14-cv-05084-MDH   Document 180   Filed 07/21/16   Page 29 of 29